GROSS et al. v. NEW YORK & T. S. S. CO.

(District Court, S. D. New York. February 28, 1901.)

1. MARINE INSURANCE—CONSTRUCTION OF POLICIES—AMERICAN CLAUSE.

A shipper of wool by rail and water contracted with the steamship company to cover the shipment by marine insurance for an additional rate of freight stated in the bill of lading, which was in accordance with the company's custom. It carried several policies issued about six months before, covering such cargo as it was required by contract to insure, and also its own risk as a carrier. Such policies were all applicable to the cargo in which the wool was shipped. The consignees of the wool, having paid a draft against the shipment attached to the bill of lading, and not knowing whether the goods were insured, reported them for insurance under an open policy carried by them for several years, under which they had covered "wool * * * not previously insured." This was before the goods had actually been received upon the ship, but while they were in course of shipment by rail. All the policies contained the American clause against double insurance, providing that "if the said assured shall have made any other assurance * * * prior in day of date to this policy, then the said assurers shall be answerable only for so much as the amount of such prior assurance shall be deficient," etc. Held, that such clause had no application as between the two sets of policies to affect the validity of either, not being applicable by its terms to insurance under an open policy, and neither the assured, the interests insured, nor the risks insured against being the same in the two cases.

2. SAME—PRIOR INSURANCE.

The policy of the consignees having been expressly limited by its terms to "wool, their own, or consigned to them, not previously insured," did not attach, the wool being already insured, not only by the contract of the steamship company, under the bill of lading rate, to carry insurance, but also by its policies which at once became pro tanto applicable thereto, although the risk had not yet actually attached; it further appearing that it was the intention of the parties that the policy should take effect only in case there had been no insurance by the consignor.

3. SAME—CONTRACT BY CARRIER TO INSURE.

It was stipulated that the consignors received the steamship company's written assurance that the shipment of wool under the insured rate would carry marine insurance, and that it was to "cover the shipment" with marine insurance; and it further appeared that the company, in ac-

cordance with its custom, insured in its own name the goods of all ship-pers on the vessel entitled to be covered by insurance in a lump sum, as well as covering by the same policies its own liability as carrier; the loss being made payable to its agents or their order. Also that, there having been a loss of a portion of the cargo, it collected by its agents the insurance payable to other shippers, and distributed it, omitting payment to the consignors of the wool only because the insurers denied liability because of the policy taken by the consignees. *Held*, that it was a reasonable inference from such facts that the contract with the consignors contemplated that the company should insure in its own name, and, in case of loss, collect and pay over the insurance; and that, having failed to do so, the consignors could maintain an action against it for the amount.

In Admiralty.

Robinson, Biddle & Ward, for libelants.
Butler, Notman, Joline & Mynderse, for respondents.

BROWN, District Judge. The above libel was filed to recover a loss of $4,279.35 from damage by fire on October 5, 1899, to 180 sacks of libelants' wool on board the respondents' steamer Leona, on a voyage from Galveston to New York; and also to recover $563.70 additional found owing to the libelants on a general average in the same matter.

The libelants, doing business at Las Vegas, N. M., as wholesale grocers and wool dealers, shipped on the Atchison, Topeka & Santa Fé Railway, on September 19, 1899, 180 sacks of scoured wool, to be transported via Purcell to Galveston and thence by the respondents, owners of the Mallory Line of steamers, to New York, and thence to Philadelphia, for delivery there to Philip Jagode & Co., who were named as consignees in the through bill of lading issued by the railway company at Las Vegas.

The stipulation as to the facts of the case, shows that by a long previous arrangement between the respondents and the railway company, the latter was authorized to issue through bills of lading at two different established rates of freight, at the option of the shipper; and that at the higher stated rates the steamship company would "cover the shipments with marine insurance from Galveston northward." The shippers in this case chose the higher rate, and that rate was accordingly inserted in the through bill of lading, which thus constituted a contract with the respondents for marine insurance from Galveston. In the division of the specified rate of freight, the extra premium to cover insurance went wholly to the respondents.

The wool reached Galveston on September 27, 1899, and went on board the respondents' steamer Leona, by which it was carried to New York. Prior to its discharge there, a fire broke out in the cargo, in extinguishing which the wool, valued at $9,434.36, was badly damaged. After a general average adjustment, the respondents' insurers not admitting their responsibility for the libelants' loss, under the clauses hereinafter mentioned, this libel was filed.

The respondents allege that they effected insurance of the wool in six specified companies, containing as usual the American clause, by which the insurers in case of prior insurance were to be answer-

able only for any deficiency in prior insurance, and that the wool was in fact covered by prior insurance under a policy of the British & Foreign Marine Insurance Company, Limited, held by Philip Jagode & Co., the consignees of the wool, in consequence of which the above six companies were not liable; also that the respondents were not answerable for the insurance in any event, but the insurance companies alone.

The libelants contend that the respondents by their contract and the usual course of dealing were directly responsible for the loss, being bound to collect it of their own insurers; and that the libelants authorized no insurance in the British & Foreign Marine Company.

The policy of the latter company was an open one, dated in 1889, but assigned in 1891 to Jagode & Co. On September 23d Jagode & Co. received from the libelants, the shippers, the through bills of lading with the libelants' draft upon them attached for $6,500, which Jagode & Co. accepted and paid. On the same day they reported for insurance under the above policy of the British & Foreign Marine Company the 180 sacks of wool on the Leona at and from Las Vegas, at a valuation of $8,000, the latter being their estimate of its probable value in the absence of any invoice. The policy contained the American clause in the same language as the six policies of the respondents. It was made "continuous" until discontinued by notice by either party to the other. The policy at the outset is declared to be (words italicized in writing, the rest printed) on account of

(a) "*whom it might concern to cover wool, their own or consigned to them, not previously insured.*"

It contains also the following clauses:

(b) "*On wool,* laden on board the good *vessel or vessels, sail or steam, and other conveyances;* to be insured, lost or not lost, at and from *ports and places in the Southern & Western states, via ports to Philadelphia.* Beginning from the loading thereof on board said vessel at *ports and places* as aforesaid, and to continue until safely landed at *Philadelphia.*"

(c) "*All shipments under this policy covered as soon as made, to be reported* * * * *as soon as known to the assured.*"

The report for insurance on September 23d was as follows:

"$8,000 on 180 sacks scoured wool; valued at sum insured; on board the railroad and S. S. Leona and connections, at and from Las Vegas, New Mexico, via Galveston and New York to Philadelphia."

The principal controversy is, whether the British & Foreign Marine Company or the six companies who were the respondents' insurers, are liable for the loss under the special clauses in the policies and the contract for insurance upon the original shipment.

In all the respondents' six policies the assured was the "New York & Texas S. S. Co., on account of whom it may concern, loss, if any, payable to C. H. Mallory & Company, agents, or to their order." All the policies bear date April 7, 1899. Four of them are for one year only, at a fixed premium, and together cover any goods shipped "at and from Galveston, upon any steamer of the line, not exceeding in all $15,000 upon any one vessel at one time, including also

transportation by rail or by other conveyance to Boston or Philadelphia"; the goods to be such only "as are transported by, or are intended for transportation by steamers owned, chartered or controlled by" the respondents' company "when the rates of freight on such goods include cost of insurance"; and also "goods on which insurance has been otherwise specially contracted for." All the four annual policies further provide that they shall "attach and cover from the time said goods are at the risk of the New York & Texas S. S. Company, and until the liability of that company is terminated, not exceeding five days after arrival at destination"; that "it is also understood and agreed that the liability of the assured as common carriers as to interest insured hereunder is covered by this policy"; and that "in case of claim under this policy, the amount hereby insured is to contribute pro rata with the whole amount of the insurance on the merchandise at risk, as described herein, effected by the assured with this or other insurance companies or underwriters."

The other two policies contain the same provision as the above, except the last provision. They were not however, annual policies, but are declared to be "continuous," and required

(13) "Reports of insurance * * * on north-bound sailings as soon as known to C. H. Mallory & Company, and practicable."

These two policies, called "excess policies," provided for insurance in excess of $15,000 on each steamer, not to exceed $100,000; one of the policies being for one-eighth of such excess, and the other for seven-eighths. All the six policies included also all risks of craft to and from the vessel.

When the libelants' wool and the goods of other shippers arrived at Galveston, the respondents sent to their New York agents to report for insurance under these two excess policies up to $51,187; and that was done on October 3d. No similar notice was required as respects the four annual policies, which, as of course, covered up to $15,000 without notice. Neither the libelants nor the respondents knew of the insurance by Jagode & Co., nor did Jagode & Co. know of the provision for insurance made by the libelants and respondents, until after the loss.

The defendants rely upon the American clause as avoiding all six policies, on the ground that the insurance by the British & Foreign Marine policy was prior to their own. The libelants rely upon the provisions of the British & Foreign policy excluding wool "previously insured."

1. The language of the American clause in all these policies is as follows:

"If the said assured shall have made any other assurance upon the premises aforesaid, prior in day of date to this policy, then the said assurers shall be answerable only for so much as the amount of such prior assurance may be deficient towards fully covering the premises hereby assured; and the said assurers shall return the premium upon so much of the sum by them assured as they shall be, by such prior assurance, exonerated from. And in case of any insurance upon the said premises subsequent in day of date to this policy, the said assurers shall nevertheless be answerable for the full extent of the sum by them subscribed hereto, without right to claim contribution from

such subsequent assurers. * * * Other insurance upon the premises aforesaid of date the same day as this policy, shall be deemed simultaneous herewith; and the said assurers shall not be liable for more than a ratable contribution in the proportion of the sum by them insured to the aggregate of such simultaneous insurance."

This clause has been introduced into American policies quite generally in order to avoid double insurance, and consequent contribution under the former English rule. Insurance Co. v. Griswold, 14 Wend. 399. Double insurance is defined by Gray, J., in Ryder v. Insurance Co., 98 Mass. 189, to be "two insurances on the same interest at the same time against the same risks." The words of this clause are carefully chosen and exact; and the decisions as respects double insurance are pertinent as to the construction of this clause.

I think this clause is inapplicable to the present case, because its language throughout excludes it.

(a) The insurance by Jagode & Co. in the British & Foreign Marine was not "made prior in day of date to the respondents' six policies," or any of them; but long after the date of all those policies. (b) That insurance was not "made," i. e. obtained, by "the assured" in the other six policies, i. e. neither by the libelants nor by the respondents; nor were Jagode & Co. the "assured" in the six policies, so that their policy could be annulled by the latter. (c) Neither the interests insured nor the risks insured against, were the same in the two sets of policies; and (d) by the last part of the clause, even if "the assured" could be deemed the same in all the policies, inasmuch as the respondents' six policies were all made long prior in date to the assurance "made" by Jagode & Co., those companies by the terms of that sentence would be required to pay the loss; while their own company, by the same clause and for the same reason, would also be bound to pay it.

Under the language of the policies these contradictions cannot be avoided. It is evident, therefore, that this clause is not adapted to insurance under prior open policies.

No doubt these difficulties may be avoided in part by substituting the words "prior in day of date to the date of entry or report under this policy," in place of the words "prior in day of date to this policy." But this would be a very material change both in the language and the meaning of the clause; and it would not cure the difficulty with the four annual policies, which require no entry or report but attach without notice. To make the clause fit the latter, it would be necessary to substitute the words "attachment of risk" in place of "date of policy," which it has been held cannot be done. Deming v. Storage Co., 90 Tenn. 306, 342, 17 S. W. 89, 97, 13 L. R. A. 518, 529. Such a change would also thwart the object of the clause to make the date the test where both policies, though of different dates, attach at the same future time. Had the parties intended this clause to apply to insurance under open policies, whether with or without subsequent entries, apt words should have been employed to make certain what the intention was. Thompson v. Insurance Co., 136 U. S. 287, 297, 10 Sup. Ct. 1019, 34 L. Ed. 408; Imperial Fire Ins. Co. v. Coos Co., 151 U. S. 452, 462,

14 Sup. Ct. 379, 38 L. Ed. 231; Home Ins. Co. v. Baltimore Ware-, house Co., 93 U. S. 527, 542, 23 L. Ed. 868.

The proviso that the prior assurance must be "made" by "the· assured" is impossible to apply here. Even if the libelants are deemed in part "the assured" under the six policies, yet they made no insurance in the British & Foreign Marine Company; they did not authorize it beforehand nor ratify it afterwards, but repudiated it. And Jagode & Co., who made the latter insurance, were not the "assured" in the other policies.

Again, the respondents' policies were made in their own names;, they expressly covered the respondents' liability to the libelants as common carriers, by sea and land, whether with or without negli-' gence; and possibly also the respondents' interest in the freight,· though that does not certainly appear. Jagode & Co.'s insurance in the British & Foreign Marine Company, covered no such interest or risk. The latter company, on payment of a loss through defend-. ants' negligence, would have by subrogation a right of indemnity, from the defendants, which the respondents' companies would not have. The policy of Jagode & Co., on the other hand, was taken out primarily for their own benefit to secure their advances of $6,500 like the separate interest of a mortgagee; while the residue of the policy, amounting to $1,500, might inure to the benefit of the libelants, if they chose to ratify it, which they never did. That policy covered, therefore, $6,500 at most, and the other policies would in any event attach for the residue of the value of the 180 sacks of wool.

The cases of Home Ins. Co. v. Baltimore Warehouse Co., 93 U. S.' 527, 23 L. Ed. 868, and Robbins v. Insurance Co., 16 Blatchf. 122, Fed. Cas. No. 11,881, were materially different. In the former, both sets of policies were expressly made payable to the plaintiff in the· case, the warehouse company, which had made advances on the goods. Both policies covered the same subject and the same risks only. The insurance was accordingly held double, and in the ab- sence of the American clause, contribution was enforced for the payment pro rata of the warehouse company's loss.

In Robbins v. Insurance Co. the factor had made no advances,. and his insurers under certain policies taken out in his own name to cover his own goods as well as other goods held by him in trust, were adjudged bound to contribute pro rata to the loss on the trust goods, insured in the principal's name, treating the insurance as double, after deducting the factor's loss on his own goods.

Where different interests or different risks are intended to be insured by different policies, there is no double insurance or con- tribution, except under some special provision. Hardy v. Insurance Co., 166 Mass. 210, 44 N. E. 209, 33 L. R. A. 241; Tuck v. Insurance Co., 56 N. H. 326; Sloat v. Insurance Co., 49 Pa. 14; Insur- ance Co. v. Scribner, 5 Hill, 298; Lowell Mfg. Co. v. Safeguard Fire Ins. Co., 88 N. Y. 591; Royster v. Steamboat Co. (C. C.) 26 Fed. 492; Insurance Co. v. Williams, 11 C. C. A. 503, 63 Fed. 925; North British & M. Ins. Co. v. London, L. & G. Ins. Co., 5 Ch. Div. 569. And similarly, different policies designed to cover different inter-·

ests or different risks, do not fall within the American clause. In the absence of any direct authority as to the construction of this clause in the relations here considered, and in view of the incongruity of its expressions, I do not think the court should attempt to extend it to the present case, which is so plainly outside of the natural import of its language.

2. Upon the above view it is unnecessary to consider any question that might arise as regards contribution, because the British & Foreign Marine Company's policy at its inception is expressly limited to "wool * * * not previously insured"; and under that clause I think the latter company is not liable at all. For at the time the insurance was made on this wool in that company the evidence shows, as respects insurance from Galveston to New York and Philadelphia, that this wool was already insured, not only by the respondents' contract under the bill of lading rate to cover with or carry insurance, but by the four annual policies, which instanter were pro tanto applicable and inured thereto.

The respondents' contract was irrevocable between the parties, except by mutual consent, from the moment of shipment on September 19th. The premium was fixed and absolutely payable as part of the freight; no return of it could be claimed from the libelants on account of Jagode & Co.'s insurance. Insurance thus absolutely provided for by a valid contract with responsible parties, is I think prior insurance within the ordinary commercial understanding, and within the intention of the British & Foreign Marine policy, although the risk had not yet actually attached.

It is a very common thing for policies to be issued which are to attach, like the four annual policies in this case, at some future date, or event. Such insurance is fairly, I think, within the words "previously insured" from the time the policies or contracts are executed and delivered. Insurance is effected, though the risk has not actually begun; and independent policies of that kind would I think be so treated under the American clause, i. e. the one prior in date would supersede one of later date.

Mr. O'Brien, the agent of the company, testifies that the proviso in question was inserted in the policy to cover precisely such cases as this, where the consignee is ignorant whether prior insurance has been provided for by the consignor or not. The intention was to enable Jagode & Co. to protect their advances, as well as the consignor, by insurance, in case provision for insurance had not been previously made. But by the libelants' contract of shipment several days before, provision had in fact been already made for all risks by sea or land from Galveston to New York and Philadelphia. The evidence shows that had this been known to Jagode & Co., their insurance would not have been made. In other words, both parties to the policy understood that the proviso meant to except insurance previously provided for, as prior insurance; and as that is not an unreasonable construction of those words, and no action of the defendants was in any way predicated upon that policy, they have no right or equity to claim for it any different meaning or extent from what was understood by the parties to it.

3. The respondents' companies being answerable under their policies for the loss, I think the present action is maintainable against the respondents; not because they are technically insurers, for direct insurance by the corporation was perhaps ultra vires; but because the mode of insurance and the course of dealing show that it was the intention of the parties that the defendant should insure in its own behalf, and therefore the respondents' duty, to collect the insurance and distribute it to those entitled to it. This it was entirely competent for the respondents to undertake to do, and this, I think, was included in the implied contract. Hill v. Scott [1895] 2 Q. B. Div. 371, 713.

The terms of the stipulation as to the facts are indecisive on this point; but they are quite as consistent with this view as the opposite, and it seems to me more so. In one passage the stipulation states that

"The libelants received the respondents' written assurance that the shipments of wool under the insured rate would carry marine insurance from Galveston northward."

This clause alone would naturally import insurance by the defendants; or if they had no power to insure, then insurance by them in some company with collection and payment to the shipper as the equivalent of insurance by themselves. Other parts of the stipulation say that the defendants were to cover the shipments with marine insurance from Galveston northward. The obligation to cover with insurance might be fulfilled in either of two ways: (a) By including insurance on the libelants' goods in their own policies which was the course adopted; or (b) by insuring the libelants' goods in specific policies and turning them over to the libelants for enforcement in case of loss, or tendering them as in The Lord of the Isles (1894) Prob. Div. 342.

In the absence of any express contract, either written or oral, the intent of the parties may be inferred from what they did in the ordinary way before any controversy arose, and that was to collect and pay over to the shipper; and this was the only reasonable result of their whole mode of dealing with the subject.

What they did was (1) to insure in their own names in six different policies the goods of all shippers entitled to be covered by insurance, in certain lump sums, amounting in the aggregate to $51,187, without reference to the individual ownership of the goods insured, and without the appropriation of any one of the policies to any particular owner; (2) to make the loss payable to the respondents' agents Mallory & Company, or their order; (3) in the same policies to insure themselves against their liability as common carrier by sea or land north of Galveston, which included insurance against negligence, risk of craft, etc.; (4) after the loss, to collect the insurance by their agents Mallory & Co., and distribute it; and (5) to omit payment to the libelants, only because the respondents' insurers claimed that the policy of the British & Foreign Marine Company absolved them from responsibility.

The respondents have never contended, prior to this controversy, that the various shippers were to recover the insurance, each for

himself; or that the respondents' agents, Mallory & Co., were not called upon to do anything in reference to the collection and distribution of the insurance; the correspondence imports the opposite and such is the general practice. Mallory & Co. did in fact look after the interests of the libelants, as they looked after the interests of all their other shippers at insurance rates. It is evident that the defense is for the benefit of the respondents' insurers only and is a matter of indifference to the respondents individually.

In making the loss payable to Mallory & Co., their agents, or their order, in all the policies, there is the strongest evidence that the respondents intended to collect the insurance and control its distribution; and in the reported cases, so far as I have noticed, suits upon similar policies have been brought by those to whom the loss is made payable. Robbins v. Insurance Co., 16 Blatchf. 122, 132, Fed. Cas. No. 11,881; Home Ins. Co. v. Baltimore Warehouse Co., 93 U. S. 527, 23 L. Ed. 868; Hartshorne v. Insurance Co., 36 N. Y. 172; Hardy v. Insurance Co., 166 Mass. 210, 44 N. E. 209, 33 L. R. A. 241.

If in agreeing that the higher rate of freight should "carry insurance," or "cover with insurance," it had been intended that the respondents should merely procure insurance for the shippers as a broker might do, which each shipper must enforce for himself, the reasonable performance of that contract would have required the respondents to procure a separate policy, or at least specific and separate insurance, for each shipper, which each shipper could identify, and with reasonable convenience enforce as his own, as in The Lord of the Isles, supra.

To lump numerous shippers all together in insurance for gross sums in numerous companies without discrimination, and then leave the shippers en masse to work out their remedies as they can, would be so embarrassing as not to constitute a proper or reasonable performance of such a contract, and would leave the respondents, therefore, answerable for not having properly fulfilled their agreement. For each shipper in a case like this would be obliged to bring six different suits instead of one, besides being entangled with other claims; and it is doubtful whether upon these policies either shipper could sue alone.

By the contract here made, however, as is to be reasonably inferred from the long practice under such contracts, it was not intended that separate policies or entries should be made for each shipper. Such a mode of conducting this business would have been clumsy and inconvenient in the extreme for all concerned. I have not the least doubt that what was done, was just what was intended to be done; that in contracting that the higher freight should "carry insurance," it was intended that the carriers might insure as they pleased, but must deliver the goods safely, or else in case of loss, deliver the insurance money to be collected by them, as the equivalent of the loss. That is the only reasonable interpretation of the obligation of the carriers under the mode of insuring adopted; and that is evidently in accord with the practice. The mere fact that their insurers chose to raise a legal question upon the policies, could

not absolve the carriers from the general duty to enforce them for the benefit of the shippers. To "carry insurance" in the mode here pursued, imports the duty to make and collect the insurance, or answer for not doing so. If it be said that this makes the goods practically at the risk of the carriers, the reply is that such was the precise object of insurance, and that was no doubt understood by the respondents; since that very liability is expressly recognized and recited in one of the clauses of the memorandum attached to all the six policies, which reads as follows:

"To attach and cover from the time said goods are *at the risk* of the New York & Texas Steamship Company, and until the liability of that company is terminated, but for not exceeding five days after arrival at destination."

Decree for the libelants with costs. If the parties are unable to agree upon the amount due, a reference may be taken to determine it.