SOUTHERN COTTON OIL CO. v. MERCHANTS' & MINERS' TRANSP. CO.

(District Court, S. D. New York. April 19, 1910.)

1. SHIPPING (§ 108*)—MARINE INSURANCE—CONSTRUCTION OF CONTRACT.

Where a carrier by water already held policies insuring it against loss through liability to cargo owners, a provision in a bill of lading, in consideration of a higher freight rate, that the cargo therein specified "is covered by marine insurance while on board, * * * under and in accordance with and subject to the conditions and limitations of policies of marine insurance held by" the carrier, must be construed as an obligation on the part of the carrier to pay the shipper's loss under the same contingencies as permitted it, through its reinsurance, to throw the loss on its own insurers.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 108.*]

2. INSURANCE (§ 479*)—MARINE INSURANCE—INSURANCE BY CARRIER—CONSTRUCTION OF CONTRACT.

A shipowner carried five annual policies of insurance, aggregating $40,000 covering its loss through liability to cargo owners, each having a rider providing that "the amount hereby insured is to contribute pro rata with the whole amount of insurance on the merchandise at risk." The carrier contracted in a bill of lading issued to a shipper to insure the cargo covered thereby in terms which measured its liability by that of its own insurers. It also held an open policy, which by its terms covered only so much of any loss as was over $40,000. The shipper also held a policy on the property shipped, which contained provisions that it should be "null and void to the extent of any amount paid by or recoverable from any carrier and/or bailee," and that "this insurance shall not inure to the benefit of any lighterman or carrier whatsoever." *Held* that, as applying to the contract of the carrier with the shipper made by the bill of lading, the "whole amount of insurance on the merchandise at risk," within the meaning of the riders, and which was to be taken into contribution, did not include its open policy, which by its terms did not attach to the same risk as the annual policies, nor the shipper's policy, which was clearly limited not to come into any contribution with the carrier.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1244, 1245; Dec. Dig. § 479.*]

3. SHIPPING (§ 108*)—MARINE INSURANCE—CONTRACT OF INSURANCE BY CARRIER AGAINST FIRE—EFFECT.

In such case the contract of the carrier with the shipper had the effect of voluntarily restoring its common-law liability for loss by fire, abrogated by Rev. St. § 4282 (U. S. Comp. St. 1901, p. 2943), and having the right to recover on such liability, whether under or over the $40,000, to that extent the shipper could not recover on its own policy, which would make it inure directly to the benefit of the carrier, and the latter could

not for that reason invoke such policy to discharge or lessen its own liability.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 108.*]

In Admiralty. Suit by the Southern Cotton Oil Company against the Merchants' & Miners' Transportation Company. Decree for libelant.

The libelant on the 17th day of July, 1907, shipped on board the respondent's steamer Allegheny at Savannah, Ga., bound for Philadelphia, a quantity of cooking oil and lard compound, the value of which was $3,635. The goods were destroyed by fire en route without negligence upon the part of the respondent. The two bills of lading which covered the shipment limited the carrier's liability except in case of payment of a higher freight rate. The libelant paid the higher rate, and received bills of lading upon which the following was stamped: "Insured Rate. The freight mentioned in this bill of lading is covered by Marine Insurance while on board the steamers of the Merchants' & Miners' Transportation Company under and in accordance with and subject to the conditions and limitations of policies of marine insurance held by them."

At the time of the destruction of the libelant's goods, the respondent held six policies of marine insurance upon goods shipped in its steamers on northbound voyages. The total value of the cargo upon this voyage, all of which was shipped under similar bills of lading, not including the libelant's shipment, was $37,567.16, all of which was a total loss. The libelant at the time of the shipment and loss held an open marine policy in the London Assurance (Marine) dated November, 1901, and attaching when the goods were loaded at the inland town of Milhaven. This policy contained the "American Clause," and a warranty by the assured that the payment of any loss thereunder should not, directly nor indirectly, inure to the benefit of any carrier or bailee, and that the policy should be null and void to the extent of any amount paid by or recoverable from any carrier or bailee. After the loss the London Assurance Company paid to the libelant the amount of the loss, but upon the understanding that the said payment should be regarded as a loan, repayable to the insurer only to the extent that any recovery should be had from the carrier. Of the respondent's six policies, all of a later date than the libelant's, five were annual, aggregating $40,000, and the sixth an open policy from $40,000 to $100,000. Each attached on the cargo when laded. The five annual policies each contained the same "rider" to which reference is made in the opinion. The respondent insists, first, that the libelant has been paid in full; second, that the London Assurance Company must bear the loss; and third, that at most there must be contribution. The libelant insists that the respondent's liability is primary under the language of the several policies.

Kneeland & Harison, for libelant.
Carter, Ledyard & Milburn, for respondent.

HAND, District Judge (after stating the facts as above). It will be more simple to consider this case first, as though the shipper were himself suing for the loss and afterwards to see what difference it makes that he has been paid by the London company. There being no common-law liability under the circumstances (Rev. St. § 4282 [U. S. Comp. St. 1901, p. 2943]), the carrier is only responsible because of the obligation contained in the words stamped on the bill of lading. These may be considered in two ways: First, as a direct covenant of insurance; second, as an undertaking to procure insurance elsewhere, to collect it, and pay the proceeds to the shipper. Doubtless the sec-

ond is the more natural interpretation, and is that put upon similar words by Brown, J., in Gross v. N. Y. & T. S. S. Co. (D. C.) 107 Fed. 516. It is quite obvious, however, that the carrier's policies do not permit the interpretation of being direct insurance upon the goods. This is true because they are expressly limited (except the Atlantic policy) as reinsurance of the carrier's own risk. If the words on the bill of lading meant only that the carrier should procure direct insurance, he did not therefore perform the obligation, for he failed to procure such insurance. In view of these circumstances it would seem a more natural construction, in view of the fact that the carrier had already taken out these policies when he issued the bills of lading, to say that the obligation was to pay the shipper's loss under the same contingencies as permitted him through his own reinsurance to throw the loss upon his own insurers. This I do not think was ultra vires a carrying corporation, and did not constitute doing an independent insurance business. The terms of his liability are then to be sought in his own reinsuring policies, just as though he had issued a policy to the shippers in the same words, mutatis mutandis, as the companies issued policies to him. In the five closed policies occur these words, added by the printed "rider," presumably prepared and annexed by the carrier himself:

"The amount hereby insured is to contribute pro rata with the whole amount of insurance on the merchandise at risk."

These words I must regard as incorporated into the carrier's own obligation, and the question becomes, What is "the whole amount of the insurance on the merchandise at risk"? Does that amount include as well both the Atlantic and the London policies, or does it include only the London and the five closed policies, or does it include simply the five policies which amount to $40,000?

The "insurance," within the meaning of the "rider," did not include the Atlantic policy, which by its terms covered only so much of the loss as was over $40,000. If that policy were included in the total insurance which must contribute under the clause in the "rider," the result would be to leave the insured partially uncovered; because if the Atlantic policy did not attach till the loss was over $40,000, and if the five policies could limit their liability to a proportionate share of the loss based not only upon the five policies themselves, but also upon the Atlantic policy, a portion of the first $40,000 would be borne by the insured. Of course, nobody intended any such result, and it is obvious therefore that "the whole amount of insurance on the merchandise at risk" did not include the Atlantic policy, and that had it not been for the London policy the five annual policies would have borne between them the whole loss up to $40,000. The result of this reasoning may be shortly stated thus: That the "other insurance" contemplated by the "rider" did not include any which by its own terms was in effect limited not to share with annual policies themselves.

Coming, now, to the London policy, the respondent urges that it contains the American clause, and that both in day of date and in day of the attachment of the risk it was the earliest insurance of all. This is true, but the libelant answers that in spite of this it contained the words already mentioned:

"This policy shall ·be null and void to the extent of any amount paid by or recoverable from any carrier and/or. bailee."

And also the words:

"This insurance shall not inure to the benefit of any lighterman or carrier whatsoever."

I agree that it would be an undue restriction of the words to limit them to the liability of the carrier as such. The contract was written in general words, and it should stand as it was written. It was not at all unreasonable, in view of section 4282, that the parties should contemplate just such a voluntary undertaking by the carrier against fire as arose in the case at bar. So construed, by voluntary agreement, the parties would supply to their relations that part of the original common-law liability which the statute had abrogated. The question, then, is of the meaning of the clauses, assuming that they apply to other insurance taken out by the carrier as well as to his common-law liability.

The precise question always remains, however, what was the meaning of the clause in the "rider," because it is only in accordance with the terms of his agreement that the carrier may be charged in respect of these policies. As I have shown above, the words in the "rider" could not have intended to include insurance upon which the shipper could not have recovered while the five policies remained unexhausted. Therefore, if the shipper should have settled with the five policies for less than the full amount, and because he supposed that he would retain rights against the London company, could he thereafter sue the London company for the balance? If he could do so, I believe that it is contributing insurance under the clause in the "rider"; if not, it is not. If he should try to do this, would he not be met at once by the plea that such a recovery against the London policy would make it inure directly to the benefit of the carrier's obligations? It is true that that clause more aptly includes the right of subrogation, but it is not quite clear that this result is precisely the equivalent of subrogation by the carrier to the shipper's claim against the London policy. No doubt the result arises in a different way, but it is just the same, and the London policy would inure to the benefit of the carrier and exonerate him, quite as completely as though he filed a bill for subrogation. I think, therefore, that the London company clearly meant not to come into any contribution with the carrier, and that therefore the carrier may not use it as contributing insurance under the clause in the "rider." The American clause in the London policy has, therefore, nothing to do with the question, for the whole policy was limited so as not to come into effect till the carrier's liabilities were exhausted.

In respect of the Atlantic policy the question is of the American clause in it as against the American clause in the London policy. Clause for clause the Atlantic policy must win, for it too was subsequent both as regards the respective rates when the risk attached and when the policies were issued. Brown, J., in Gross v. N. Y. & T. S. S. Co. (D. C.) 107 Fed. 516, 520, construes the words "shall have made any other assurance" as referring to the attachment of the risk, and in the case at bar the shipper had "made" no·assurance with the Lon-

don company prior to the date of the Atlantic policy in this sense. On the other hand, the insurance "made" by the shipper by virtue of the bill of lading was after the date of the London policy which would make that company liable. However, I think it is not necessary to decide that question, because the construction of the clause in the London policy, adopted above, excludes as well the Atlantic policy as the five annual policies. If the London policy bears that part of the loss which the Atlantic policy otherwise would bear, it has "inured" to the benefit of the carrier quite as truly as it would "inure" to the benefit of the five policies. If the Atlantic company could urge its exemption under the American clause, and if the London company could insist upon exemption under its own peculiar clause, then the shipper was in part uninsured; which cannot be. One must yield, and I think it reasonable that the "assurance made," as referred to in the Atlantic policy, must be read as an assurance not so limited as to be null and void, if marshaled in a hotchpot along with the carrier's obligations.

Thus, even upon the assumption that the risk was the same, and the parties the same, in the carrier's insurance effected by the bill of lading and in the London policy, still, by the necessary intention of the parties, I think the carrier must be understood as having intended not to exempt from his insurance that much of the risk which another insurer expressly declined to assume.

The rights of the shipper being thus determined, the effect of the payment by the London company is exactly covered by the case of Bradley v. Lehigh Valley R. R. Co., 153 Fed. 350, 82 C. C. A. 426, and a decree is proper for the full amount of the loss against the respondent.

A decree to that effect may therefore be entered.