## THE GRECIAN.

## THE CITY OF CHATTANOOGA.

### No. 387.

Circuit Court of Appeals, Second Circuit.
July 15, 1935.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight and Wharton Poor, both of New York City, of counsel), for claimant and respondent-appellant.

Duncan & Mount, of New York City (Russell T. Mount and Charles R. Millett, both of New York City, of counsel), for libelant-appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The libelant's ship Grecian, bound from Boston to Norfolk, Newport News, and Baltimore, cargo laden, became a total loss when it collided with the claimant's City of Chattanooga on the high seas off Block Island May 27, 1932. The collision was due to the mutual fault of the vessels without knowledge or privity on the part of the

owner of either. The value of the City of Chattanooga after the collision exceeded the amount of all possible claims against her and no attempt to limit liability was made. The owner of the Grecian sought through proceedings which are still pending to limit its liability to the amount of freight money pending which was much less than the amount of damage claims. The owners of cargo on the Grecian filed claims which the libelant settled by payment in exchange for loan receipts.

With the situation as stated, the libelant brought this suit as owner of the Grecian and as bailee of her cargo against the City of Chattanooga and her owner to recover for the loss of ship and cargo. The answer, so far as now material, set up an affirmative partial defense as follows:

"Eighth: At the time of said collision, the s/s Grecian was bound from Boston to Norfolk, Newport News and Baltimore, and the cargo on board the s/s Grecian was carried under bills of lading (all in the same form, being a form approved by the Interstate Commerce Commission) and in accordance with a tariff filed with the Interstate Commerce Commission. Said bills of lading provided in part as follows:

"'Sec. 9. (a) If all or any part of said property is carried by water over any part of said route, such water carriage shall be performed subject to all the terms and provisions of, and all the exemptions from liability contained in, the Act of the Congress of the United States, approved on February 13, 1893, and entitled "An Act relating to the navigation of vessels, etc.," and of other statutes of the United States according carriers by water the protection of limited liability, and to the conditions contained in this bill of lading not inconsistent therewith or with this section. * * *

"'(e) If the property is being carried under a tariff which provides that any carrier or carriers party thereto shall be liable for loss from perils of the sea, then as to such carrier or carriers the provisions of this section shall be modified in accordance with the tariff provisions, which shall be regarded as incorporated into the conditions of this bill of lading.'

"A copy of one of said bills of lading is hereto annexed, made a part hereof, and marked Exhibit A.

"Ninth: Said tariff filed with the Interstate Commerce Commission provided 'Rates Include Insurance' and further contained provisions reading as follows:

"'Insurance. Property moving under rates named or provided for in this tariff, while in the custody of the water carriers, from the time they receive it from shipper or from prior connecting carriers on docks, piers, wharves, bulkheads, platforms, lighters and/or craft, transfers and land conveyances at ports of loading of their vessels, and while it is waterborne on vessels at and between ports and while it is on docks, piers, wharves, bulkheads, platforms, lighters, and/or craft, transfers and land conveyances at port of discharge of vessels, until it is delivered to consignee (but not beyond the free time allowed for delivery as designated by tariff lawfully on file with the Interstate Commerce Commission and/or the United States Shipping Board, as the case may be, nor while held by the water carrier as warehouseman) or until it is delivered to connecting carriers thereat, is insured:

"'While Waterborne, against the perils of the seas, rivers, lakes, bays, canals and other waters, fire, collision, stranding, jettison, pirates, assailing thieves, barratry of the master or mariners, and other like perils or misfortunes that have or shall come to the hurt or damage of the said property or any part thereof, including general average charges and expenses for which the owner may under the maritime law be chargeable. * * *'

"Tenth: All of the owners of the cargo on the s/s Grecian have filed claims against the libelant herein, Merchants & Miners Transportation Company, under and pursuant to the provisions of said bills of lading and tariff, and said Merchants & Miners Transportation Company has paid said claims against so-called loan receipts, the form of check given in payment and the form of the receipt given by the owners of the cargo being that attached hereto and marked Exhibit B.

"Eleventh: By reason of the premises aforesaid libelant, under its bills of lading and tariff, waived the defense of the Harter Act and all other rights of limitation or exemption and assumed the liability of an insurer of said cargo on the s/s Grecian. Said cargo owners therefore became entitled to a right of recovery against the Merchants & Miners Transportation Company for their full loss as well as a right of action against the s/s City of Chattanooga and her owner and all of the par-

ties being before the Court and both ships at fault the cargo loss must be divided equally between them."

Exceptions to this part of the answer were filed and sustained with leave to amend. Thereafter the answer was amended by adding the following: "Ninth (a) At the time of the receipt of said cargo by libelant and at the time of said loss there were in full force and effect a number of policies of insurance, issued by some forty underwriters, in the form annexed, made a part hereof and marked Exhibit C, said Exhibit C covering 2% of the risk insured and the other policies in said form covering, in varying percentages, the remaining 98% of the risk. Said Exhibit C and other policies in like form covering the remaining 98% of the risk constituted the only insurance effected by or on behalf of libelant in any way relating to cargo on the s/s Grecian."

The exceptions to the answer were then renewed, and this appeal is from the interlocutory decree sustaining them.

We are not now concerned with the libelant's right of recovery for the loss of the Grecian itself, but only with that part of its alleged cause of action wherein it has sued as bailee of her cargo. The precise position of the appellant is that because in the bills of lading under which the cargo was carried were incorporated certain provisions of a published tariff filed with the Interstate Commerce Commission, which will be discussed later, the owners of the Grecian became liable as insurers for the loss of its cargo, the libelant can recover only a moiety of that loss from the appellant.

■ Certain legal principles of general application to the right of recovery for cargo damage resulting from the collision of two vessels due to the fault of both are both well established and undisputed by these parties. They are that the owners of cargo on the ship lost where the carrying ships are mutually at fault for the collision which caused the cargo damage may recover in full from the noncarrying vessel, The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Atlas, 93 U. S. 302, 23 L. Ed. 863; The Toluma (C. C. A.) 72 F. (2d) 690; and that the owner of the noncarrying vessel may add to her damages the damages so recovered by cargo from the noncarrying vessel for the purpose of final

division of damage as between the two ships, The Chattahoochee, 173 U. S. 540, 19 S. Ct. 491, 43 L. Ed. 801. Moreover, when the provisions of the Harter Act (46 USCA §§ 190–195) do not apply, the cargo owner, entitled to a recovery against both vessels at fault, may not recover a judgment in solido against both for his whole damage with the right to an execution against either as at common law for his whole damage but only a judgment against each for a moiety of the damages with the added secondary liability of each for the other's share. The Hudson (D. C.) 15 F. 162; The Sterling and The Equator, 106 U. S. 647, 1 S. Ct. 89, 27 L. Ed. 98. And this principle holds true where a shipowner sues as bailee of her cargo. The Doris Eckhoff (D. C.) 41 F. 156. Thus it will be seen that the decisive question upon this appeal is whether the libelant by its contract of carriage waived the provisions of the Harter Act. It might waive the benefit of such a statute and the issue must be narrowed to a determination of whether or not the evidence relied upon to establish the claimed waiver is sufficiently clear and convincing to be taken to establish that fact. See Bank Line v. Porter (C. C. A.) 25 F.(2d) 843; The Ida (C. C. A.) 75 F.(2d) 278; The Gerald A. Fagan (C. C. A.) 49 F.(2d) 215; The Nat Sutton (C. C. A.) 62 F.(2d) 787.

These bills of lading were originally issued by the Boston & Maine Railroad. Section 9, which relates to carriage by water, after incorporating by reference the Harter Act and other statutes not here material, provided in subdivision (e) as follows: "(e) If the property is being carried under a tariff which provides that any carrier or carriers party thereto shall be liable for loss from perils of the sea, then as to such carrier or carriers the provisions of this section shall be modified in accordance with the tariff provisions, which shall be regarded as incorporated into the conditions of this bill of lading."

The tariff which was alluded to above provided, so far as important herein, that: "Property, moving under rates named or provided for in this tariff, while in the custody of the water carriers, * * * is insured: While waterborne, against the perils of the seas, * * *, collision, * * *, and other like perils or misfortunes that have or shall come to the hurt or damage of said property or any part thereof * * *."

If this language in the tariff is to be construed to mean that the libelant became liable to its cargo for loss from perils of the seas, the provisions of the bills of lading were modified in accordance with such tariff provisions. If so the libelant thereby waived the benefit of the Harter Act leaving it liable to its cargo, and in that event it is entitled to recover from the appellant only one half of the cargo damage.

The meaning of similar language used under similar circumstances has been held not to make the carrier itself an insurer but to require it to place insurance upon the cargo and collect it for the shipper. Gross v. N. Y. & T. S. S. Co. (D. C.) 107 F. 516; Virginia-Carolina Chemical Co. v. Chesapeake Lighterage & Towing Co. (C. C. A.) 279 F. 684. In Southern Cotton Oil Co. v. Merchants' & Miners' Transp. Co. (D. C.) 179 F. 133, it was recognized that this was the more natural interpretation, and the decision turned upon the failure of the carrier to procure insurance as agreed. We are entirely in accord with the construction of such language in the cases cited. It is reasonable, and similar use after those decisions is additional reason for believing that the parties intended what the words in such a context had been held to mean.

A decision of the Interstate Commerce Commission, Wyman, Partridge & Co. et al. v. Boston & Maine R. R. et al. (1908) 13 I. C. C. 258 (see, also, Id., 15 I. C. C. 577), is much relied on by the appellant. We think it fails to give the support attributed to it. There had been an increase in the through rates from the east to the middle west by combined rail and lake transportation which was attacked by the shippers. The attempt was made to show that the advanced rates were reasonable upon the ground that they included insurance. It was held that the procurement of insurance by the carrier was not a sufficiently adequate service to make the increase reasonable and that a direct assumption of liability was required to support the new rate. Thereupon, the carriers changed their tariff to provide that "the lake carrier and the rail carrier delivering the property to the lake carrier jointly assume liability for loss or damage to said shipments caused by marine perils," which were enumerated, and the Interstate Commerce Commission ordered them to put such a provision into their bills of lading with the recommendation that subdivision

(e) of section 9 be likewise added. Wyman, Partridge & Co. v. Boston & Me. Railroad (1909) 15 I. C. C. 577, 582. That subdivision refers to the tariff under which the goods are carried and provides for the modification of section 9, which, as we have seen, gives the carrier in subdivision (a) the benefit of the Harter Act, so as to exclude such benefit only if the property is being carried under a tariff which provides that the carrier or carriers party thereto shall be liable for loss from perils of the sea. In the case before the Interstate Commerce Commission, this change in the tariff was made in so many words, and consequently subdivision (e) of section 9 did away with any possible doubt as to whether or not the provisions of the tariff would modify the general exemptions in the bill of lading. In the instant case, however, the tariff merely included insurance. Assumption of an insurer's liability by the carrier for loss from sea perils is lacking. Indeed it is left to the same inference which the Interstate Commerce Commission held could not be indulged to support the rate in the Wyman, Partridge Co. Case.

Nor can the order of the Commission in that case be taken to require the assumption of such liability for loss from marine perils by the carriers of cargo on the Grecian in return for the rate charged in this instance. We have no means of knowing whether the rate charged was reasonable for the service rendered regardless of such assumption of liability. So far as we know the Commission has not passed upon that. See Mitchell Coal Co. v. Penn. Ry. Co., 230 U. S. 247, 33 S. Ct. 916, 57 L. Ed. 1472; Northern Pac. Ry. Co. v. Solum, 247 U. S. 477, 38 S. Ct. 550, 62 L. Ed. 1221. And the order in the Wyman, Partridge Co. Case does not bind the appellee who was not a party and who in this instance was rendering a different service. A hearing is an essential prerequisite to the imposition of a rate. Interstate Commerce Commission v. L. & N. R. Co., 227 U. S. 88, 91, 33 S. Ct. 185, 57 L. Ed. 431; Atchison, Topeka & Santa Fé R. Co. v. United States, 284 U. S. 248, 262, 52 S. Ct. 146, 76 L. Ed. 273. We cannot beg the entire question by assuming that the rate had to include the carriers' liability as an insurer for loss from perils of the sea and undertake to construe the language of the carriage contract with reference to such

662

an unwarranted assumption. Neither does the rule of strict construction against the one who chose the language used aid the appellant, although it seeks to invoke it on the theory that the carriage contract was ambiguous in respect to assumption of liability for sea perils. It was not a party to the contract and so without the scope of the rule. National Fire Insurance Co. of Hartford v. Maddox, 224 Mo. App. 90, 20 S.W.(2d) 705, 707.

■ Nevertheless, under its agreement in the bills of lading that the cargo of the Grecian was insured, the libelant was bound at least to place and, in case of loss, to collect and pay over the insurance to the cargo owners. That is to say, the libelant was bound either to deliver the cargo safely or, if it failed to do that, to deliver the insurance to the cargo owners instead. This was its liability to cargo for loss while the goods were waterborne. For present purposes it differs little from a direct assumption by the libelant of an insurer's liability for sea perils.

■ In the amendment to the answer above quoted, it is alleged that insurance was placed. When the loss occurred it became the libelant's duty under the carriage contracts to collect and pay it to cargo. Though there is no allegation in the answer that it has not done so, except what might be inferred, had the record not shown that the libelant has paid the cargo claims and taken loan receipts, from the twelfth paragraph where the respondent alleges that if the libelant recovers in this action the entire loss sustained by the Grecian's cargo the respondent will take by subrogation the rights of the Grecian's cargo owners against the libelant, the failure of the respondent to allege a breach of the carriage contract by the libelant is not fatal. The decisive point here is that the libelant was liable to the Grecian's cargo for the loss which occurred to the extent of the collection of the insurance placed and its delivery to cargo owners.

Though the damages sustained by the Grecian's cargo for which the libelant assumed liability under the bills of lading was only as above indicated, the tariff under which the cargo was being carried did make the libelant to this extent liable for loss from sea perils. By virtue of subdivision (e) of section 9 of the bills of lading, above quoted, the provisions of subdivision (a) of that section were so modified that the Harter Act did not exempt the libelant from all liability to its cargo as the result of a collision due in part to the fault of its ship but without its privity or knowledge. We need not go so far as to say that such a waiver of the Harter Act left the libelant with the insurer's liability of a common carrier unmodified by statute. It is enough that the libelant was liable under the provisions of the tariff to the owners of the Grecian's cargo for the loss occasioned by the collision. Because of that, only a moiety of such cargo loss may be recovered from the respondent in this action. The Doris Eckhoff, supra; The Sterling and The Equator, supra; The Hudson, supra.

The interlocutory decree is reversed, with directions to overrule the libelant's exceptions to the answer.