## THE S. V. LUCKENBACH.

### THE OTTA.

(Circuit Court of Appeals, Second Circuit. May 13, 1912.)

#### Nos. 212, 213.

**1. COLLISION (§ 83*)—STEAM VESSELS MEETING—MUTUAL FAULTS.**

A collision in upper New York Bay, near the eastern edge of the anchorage grounds, in a fog, between the steamships Otta, passing down, and Luckenbach, passing up, *held* due to the faults of both vessels in going at too high speed; the Otta also being in fault for failing to sound fog signals, or to stop on hearing or seeing the Luckenbach ahead, as required by article 16 of the Inland Rules (Act June 7, 1897, c. 4) 30 Stat. 99 (U. S. Comp. St. 1901, p. 2880), and the Luckenbach for being on the wrong side of the channel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 156, 167, 175; Dec. Dig. § 83.*

Collision rules, speed of steamship in fog, see note to The Niagara, 28 C. C. A. 532.]

**2. COLLISION (§ 154*)—SUITS FOR DAMAGES—COSTS.**

The expense of taking photographs showing injuries to a vessel in collision and for interpreter's fees necessary to obtain the testimony of foreign witnesses *held* properly taxable in a suit for collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 308; Dec. Dig. § 154.*]

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by Lorentz W. Hansen, managing owner of the steamship Otta, against the steamship S. V. Luckenbach, Edgar F. Luckenbach, and others, claimants, and cross-libel by such claimants against the Otta. Decree dividing the damages, and libelant appeals. Modified and affirmed.

See, also, 197 Fed. 893.

On appeal by Lorentz W. Hansen, libelant, managing owner of the steamship Otta from a decree holding the Otta and the Luckenbach both at fault for a collision which occurred during a fog, in the upper Bay of New York at or near the eastern boundary of the general anchorage which lies south of the Statue of Liberty.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

Haight, Sanford & Smith (Charles S. Haight and Clarence Bishop Smith, of counsel), for the Otta.

Wallace, Butler & Brown (James K. Symmers, of counsel), for the Luckenbach.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. [1] On April 4, 1910, between 1 and 2 o'clock in the afternoon, the steamship Luckenbach from Porto Rico was proceeding up the harbor of New York destined for Pier 26, Brooklyn. She is 400 feet long and 41 feet beam and was loaded at the time of the collision, her draft being about 24½ feet. The weather was foggy and the tide flood; the set of the tide was, however, somewhat counteracted by a North River freshet prevailing at the time.

The Luckenbach left quarantine at 12:50, the fog growing somewhat thicker as she proceeded. The story of the collision as told by her master is briefly as follows:

The Luckenbach passed bell buoy No. 12½ about 400 feet to the westward. On passing the buoy she straightened on her course N. E. by N. The regular channel as far north as Governor's Island is about five-eighths of a mile wide. On account of the fog, the Luckenbach was going dead slow. Those on board could see about two ship's lengths ahead. They were blowing fog signals every minute. The master and second officer were on the bridge and there were two lookouts stationed on the forecastlehead. She kept her course of N. E. by N. until about four minutes before the collision. This course would have kept her well to the eastward of the center line of the channel and about 500 feet from the easterly line of the channel. Had she maintained this course, if the same is correctly plotted on the chart "Otta's Exhibit No. 1," a collision with a vessel west of the center channel line would have been impossible. The change that she made was to N. E. ½ N. The master says in explanation of the change:

"Well, I can't tell exactly. I thought I probably appeared to be too much to the westward, as I could see—I began to see the ships on the anchorage ground on the west side."

The new course had the tendency to bring him further to the eastward. He says he was intending to go around the north end of Governor's Island into the East River. He saw the Otta about 1,000 feet distant on his starboard bow coming down the river on a parallel course, so that if she had kept her course the two vessels would have passed starboard to starboard with 100 feet of water between them. He heard no signal from the Otta. The instant he saw her he reversed his engines and stopped, went full speed astern and blew the backing signal of three blasts. When he first saw the Otta she started to blow one whistle, continued to blow it and came to port swinging at full speed to westward directly across the Luckenbach's bow. The Luckenbach was backing away from the Otta at full speed, when the latter struck a glancing blow right across the Luckenbach's stem.

The account of the collision given by the master of the Otta, briefly stated, is as follows:

At about 11:40 a. m., April 4th, the Otta, a steamer about 325 feet in length, left Yonkers unloaded, destined for Philadelphia, where she expected to procure a cargo. From Yonkers to the Battery was misty and somewhat foggy but land could be seen on both sides of the river. At about 1:10 the Otta got down abreast of the Statue of Liberty, which was plainly visible and those on the bridge could see objects half a mile distant. Passing the Statue of Liberty, the Otta's master saw several anchored vessels on his starboard side and he passed a ferryboat which was coming up. In addition to the pilot, the chief officer was on the forecastle; the quartermaster was at the wheel and the master was on the upper bridge with the pilot, who gave the signals. When in the vicinity of the Statue, the vessel was proceeding at half speed. After exchanging signals with the ferryboat the Luckenbach was sighted right ahead about half a mile distant. The Luckenbach blew one whistle and the Otta answered with one and put her wheel hard aport at full speed ahead. As she came on she blew two or three whistles, "or two or three times the same whistle." The Luckenbach did not answer these signals, but when she came up close, about a ship's length away, she blew three whistles. The Otta's engines were put full speed ahead, so that the vessel would answer her helm quickly and sheer to starboard. The Luckenbach did not change her course except to go in the opposite direction from the one indicated by his whistle. As the Otta swung to starboard, the Luckenbach continued to swing towards her. After the Luckenbach's three blasts, the Otta's wheel was put hard astarboard just before the collision to swing her stern to starboard and ease off the blow which was then inevitable. She was struck on her port quarter about 20 feet from her stern.

The collision broke the Otta's port rudder-chain and she drifted to the southward so near to the Frieda which was at anchor to the westward of the channel, that the latter ship got her fenders ready, fearing a collision.

These statements of the masters are corroborated by the members of the crews of the respective vessels. They cannot be reconciled, both cannot be true, and yet it is not necessary to find that either crew has committed perjury. The well known loyalty of seamen for their own ship is both natural and praiseworthy. It leads them unconsciously to espouse the cause of the vessel that carries them Not only the crew, but passengers also are imbued with the same spirit and seldom see negligence in the navigation of the vessel on which they are temporarily embarked. In such cases it is necessary to have recourse to extrinsic evidence and to weigh the presumptions drawn from undisputed facts. No matter which of the above versions is considered, it is absolutely certain that such an accident could not have taken place on a bright, clear day. There was nothing unusual in wind or tide and if the atmosphere had been clear, so that the vessels could see each other four or five miles distant, in a deep channel over half a mile wide, a collision at or west of the western

boundary of the channel could only be accounted for upon the theory that the navigators on both of the vessels had suddenly become insane.

There can be no doubt that a fog existed. The question of its density is the one upon which the witnesses disagree. The fact that such a collision occurred offers strong presumptive evidence that it was dense enough seriously to interfere with navigation. The preponderance of testimony sustains this view. Like most fogs, it varied in density, lifting at times and again shutting down. We have no doubt that the situation was one requiring the greatest care and the constant sounding of fog signals, by bell and whistle, and most of the vessels in the vicinity recognized this fact.

The official report of the weather observer at New York states that the fog which had previously been light became dense at 1:20 p. m. and so continued until 2:30 p. m. The witnesses, stationed as they were at different points, differ as to the density of the fog, but all agree that it existed and that it was more or less a menace to safe navigation.

In such circumstances it is the duty of vessels to proceed with the greatest caution and to give frequent warning signals. Article 16 of the act of June 7, 1897 (30 Stat. 99, c. 4 [U. S. Comp. St. 1901, p. 2880]), provides:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

The Otta was at fault for not complying with this rule. She does not pretend that she blew fog signals after passing the Liberty Statue. Her obligation to do this was, perhaps, increased because she was originally painted white and this had changed to a lead color which is difficult to detect in a fog. We cannot credit the statement of the Otta's pilot that he sighted the Luckenbach when she was half a mile away, first, because his conduct thereafter was inconsistent with having seen her at so great a distance, and, second, because it seems most improbable that the collision could have happened if they had received such timely warning. The fact is that when he first sighted the Luckenbach, the danger was so imminent that his first impulse was to stop and he actually sent an order to that effect, but before it could be executed, he changed it to an order for full speed ahead and immediately ported his helm and then hard aported it. This does not indicate the calm and deliberate judgment of a pilot with ample time to consider a maneuver, but indicates rather that he was confronted with a sudden peril and became confused in its presence. His first impulse was the correct one. Had he stopped, the collision would not have occurred. If the vessels were meeting on parallel courses, each having the other a point and a half on her starboard bow, it was the pilot's duty to give two short blasts of his whistle, starboard his helm and pass starboard to starboard.

Article 18, rule 1, provides:

"But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other."

That the Luckenbach should have blown a single blast passing signal seems most extraordinary and makes the fault of the Otta in mistaking the Luckenbach's fog signal for a passing signal more apparent. We are unable to make the Otta's navigation square with the prudence which should govern human conduct in such a crisis. The Luckenbach was not blowing passing signals and the Otta should have known this. Even after it was apparent that the Luckenbach did not understand the Otta's proposal, the latter kept on full speed directly across the former's bows. The Otta was not navigated with prudence or good judgment. She should have known that the Luckenbach's long blasts were fog signals and she should have reversed and stopped before she got into the jaws of collision.

The Luckenbach, according to her witnesses, was proceeding at slow speed, making 2½ to 3 miles an hour through the water. Here chief engineer says that:

"We were running slow, maybe a couple of minutes and then stopping and then going ahead slow for a couple of minutes or so and then stopping again."

This testimony is inconsistent with the undisputed fact that the Luckenbach left Quarantine at 12:50 and the collision occurred at 1:30, or 40 minutes thereafter. In other words, she made about 4½ miles in 40 minutes, or about 600 feet per minute. This can hardly be considered moderate speed in such a fog as was then prevailing.

When the Luckenbach passed buoy No. 12½ she was about a ship's length from the easterly edge of the channel. She then took a compass course of N. E. by N. which, had she maintained it, would have kept her on her own side of the channel and would have made the collision on the westerly side of the channel impossible. That it occurred there and very near to the extreme westerly side, if not actually on the anchorage ground, we have no doubt. The Luckenbach evidently got off her course and drifted over to the left-hand side of the channel where she had no right to be. It is not necessary to review the testimony which leads us to the conclusion that the collision occurred on the westerly side of the channel. It is enough to refer to the testimony from the Ikalis and Frieda, which were anchored with about 900 feet of water between them, well over on the anchorage ground and west of the channel. After the collision the Otta became unmanageable, her rudder chain being broken, and she drifted helplessly down so near the Frieda that there was danger of collision; she passed near the Ikalis and finally came to anchor close under the latter's starboard quarter, near the westerly line of the channel. These physical facts make it impossible to find that the collision occurred on the easterly side of the channel and outweigh all the theories and presumptions advanced on behalf of the Lucken-

bach to the effect that she was not out of her course when the collision occurred.

The negligence of the Luckenbach in getting so far out of her course is alone sufficient to condemn her. Had she navigated with prudence, slowing down to bare steerage way and paying proper attention to fog signals on land and water, she would not have gotten so far from her proper course. Being on the west side of the channel in the track taken by outgoing vessels, the danger of collision was greatly enhanced.

The controversy is unusually perplexing, owing to the large number of witnesses and the sharp conflict upon the many vital questions of fact, but our examination leads us to the conclusion reached by the district judge that both parties were at fault.

[2] We think the items of $20 paid for photographs and $20 paid for interpreter's fees should be allowed. There is no better way of giving the court exact knowledge of the extent and character of the injury in collision cases than by presenting photographs of the injured vessel. They show at a glance what pages of testimony could not so well portray. The interpreter's fees were also a proper and necessary disbursement. Without his services the court would have been deprived of the benefit of the Norwegian witnesses.

These items should be allowed and the decree as so modified is affirmed without interest pending appeal, and with half cost of certifying and printing record to the appellant.

