## THE DOMIRA.
## THE IRLAND.
## THE PINAR DEL RIO.
### Nos. 194, 195.

Circuit Court of Appeals, Second Circuit.
March 7, 1932.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and James W. Ryan, both of New York City, of counsel), for intervening petitioners-appellants Niles-Bement-Pond Co. et al., owners of cargo on The Domira.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for The Domira.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of

New York City, of counsel), for appellee The Irland.

Lord, Day & Lord, of New York City (Allan B. A. Bradley and James S. Hemingway, both of New York City, of counsel), for appellee the Santa Clara Steamship Co., Claimant of S. S. Pinar Del Rio.

Before MANTON, AUGUSTUS N, HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

These appeals, by the master of the steamship Domira and the intervening petitioners Niles-Bement-Pond Company and others, seek a review of the final and interlocutory decrees entered below and bring into question the responsibility for a collision between the steamship Domira and the motorship Irland in Ambrose Channel on December 31, 1927.

On that morning, the motorship Irland arrived from Boston and anchored off Ambrose Light Vessel. She got under way again at 10:27, and moved up toward the entrance of the channel. The weather was hazy when the Irland arrived, but cleared by the time she got under way. Her engines were at various speeds until she stopped at 10:45. A Sandy Hook pilot boarded the vessel at 11 o'clock. The weather was then clear, wind south, and tide flood. She entered the channel and proceeded up on her starboard side. The master and pilot were on the bridge, the quartermaster at the wheel, and the chief officer and a lookout were forward. The fog set in when she was in the vicinity of Buoy 8A which was passed close to the starboard. Visibility was then reduced to about 600 feet, and fog signals were sounded at intervals of about half a minute. The Irland's full speed was 10 knots, her half speed 6 knots, and slow speed 3 to 4 knots. When in the vicinity of Buoy 10, she proceeded under slow speed, and, when a fog signal was heard from a vessel, which proved to be the Steel Mariner, she stopped her engines. She was then put slow ahead as she rounded Buoy 10 under a port helm, passing it about 200 feet to starboard. She rounded Buoy 14 under her port helm and stayed on her course, north magnetic. The course up from Buoy 14 is north ¼ west but it is testified she was put on north to compensate for the tidal set to port. While thus proceeding on her starboard side of the channel, she heard a fog signal from a vessel ahead which later proved to be the Pinar Del Rio. She stopped her engines and ported her helm. The Pinar Del Rio was crossing the channel diagonally from the Irland's port to her starboard side. The Pinar Del Rio blew a two-blast passing signal which the Irland answered with two blasts and starboarded her helm in order to pass starboard to starboard in response to the passing signals. Thereupon the Domira appeared out of the fog; no signals were heard from her as found below. She was following close astern of the Pinar and was also crossing the channel diagonally from the Irland's port to her starboard side. The Irland immediately put her engines full speed astern, sounded three blasts of her whistle, and dropped her anchors. The Domira came on, and her starboard side raked the Irland's stem, twisting it to starboard. The collision occurred at 12:12 p. m.

A dispute exists in the respective claims as to which side of the channel the vessels were on when it occurred. We are satisfied from the evidence that the finding below was correct and that it occurred on the Irland's starboard side between Buoy 14 and Buoy 16, and that the angle of collision was about 45° between the vessels' starboard sides. We are also satisfied with the finding that the Irland was heading north and the Pinar was passing the Irland starboard to starboard about 100 feet apart. After the collision, the Irland swung around stern to port, due to the flood tide and her own backing maneuver. In this swing her heading changed from north through east to about south, and the backing dragged her anchors, which were on about 20 to 30 fathoms of chain, to the west.

The Domira's version of the collision has not been consistent throughout the litigation. But counsel for the cargo owners, who are chiefly interested, argue that the point of collision was between the Irland's bow and the Domira's starboard side forward, about 575 feet east of the west side of the channel and about 1,850 feet south of Buoy 15. This contention was largely based upon the strength of expert testimony to which we shall refer later. The pilot of the Domira testified that she was about 300 feet from the west side of the channel. He also said that she did not swing any by reason of dropping her anchor except possibly to starboard, not to port.

The compass headings of the vessels at the time of collision we regard as important. The Irland was heading north as is clearly demonstrated, and the Domira was crossing the channel from west to east. The Domira's pilot said that he assumed she was on a heading south or south ¼ east; the latter being the channel course. But he does say

that he did not know positively her heading, nor did he know the Irland's heading. The court below, however, found that the Domira was not on the channel course, but crossing the channel. This conclusion is justified, considering the angle of collision and the course she was found to be on. It is most improbable that the Irland was first crossing the channel from east to west and going outside the channel on the west side in the vicinity of the West Bank Light, and then came back into the channel from west to east. The testimony of eyewitnesses in this record as to the place of collision is very acceptable and we think a guide to the true version. The Black Diamond, 273 F. 811 (C. C. A. 2); The Lexington, 266 F. 353 (C. C. A. 2).

 A different situation is attempted to be established by the testimony of an expert on navigation. He, in answer to a hypothetical question, attempted to tell the location of the collision. He was not present at the time of collision, and his opinion is expressed from the facts embraced in the hypothetical question. The trial court excluded the testimony, as well as the drawings which he made in reaching his conclusions as to the place of collision in the channel. We think that ruling correct. He could not thus compute, with any degree of accuracy, the position of the collision. The place of collision was an important fact to be determined by the trial court. To a large extent, it was a determining factor as to the responsibility and the degree thereof. While there is a modern tendency to give as wide a scope as is reasonably possible to opinion evidence in the investigation of questions which are peculiarly within the knowledge of experts in an art, so as to afford the trial judge assistance, and while a discretion is lodged in the trial judge in determining what testimony has a tendency to establish the ultimate facts and to assist in the decision, still such expert testimony is not received where the testimony has no legitimate bearing upon the questions at issue and in jury cases might well be calculated to prejudice the minds of jurors. Congress & E. Spring Co. v. Edgar, 99 U. S. 645, 25 L. Ed. 487; U. S. Smelting Co. v. Parry, 166 F. 407 (C. C. A. 8). In the Conqueror, 166 U. S. 110, 17 S. Ct. 510, 518, 41 L. Ed. 937, an admiralty case, the court said: "While there are doubtless authorities holding that a jury (and in this class of cases the court acts as a jury) has no right arbitrarily to ignore or discredit the testimony of unimpeached witnesses, so far as they testify to facts, and that a willful disregard of such testimony will be ground for a new trial, no such obligation attaches to witnesses who testify merely to their opinion; and the jury may deal with it as they please, giving it credence or not as their own experience or general knowledge of the subject may dictate."

So expert testimony has frequently been admitted on the amount of damages sustained by a vessel. The Edward G. Murray, 278 F. 895 (C. C. A. 2); The Umbria, 153 F. 851 (C. C. A. 2); The William E. Ferguson, 108 F. 984 (C. C. A. 2). Also on the value of cargo damage. The Rosalia, 264 F. 285 (C. C. A. 2). In Eastern Transportation Line v. Hope, 95 U. S. 297, 298, 24 L. Ed. 477, expert testimony was received and considered in answering the query whether it was prudent for a tugboat on Chesapeake Bay to tow three boats abreast in a high wind. The court said: "It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. * * * It is upon subjects on which the jury are not as well able to judge for themselves as is the witness that an expert as such is expected to qualify."

But where, as here, there was direct proof of the location of the collision, detailing the position by markers in the channel, there was no occasion for the trial judge to be influenced by the expert testimony as stated. In his discretion, he had the right to reject this opinion testimony. Indeed, it was based partially upon necessary inferences and assumptions to prove a factual point. The Eastern Transportation Line Case was for negligence, tried before a jury, and involved a question of nautical skill. In Union Ins. Co. v. Smith, 124 U. S. 405, 8 S. Ct. 534, 31 L. Ed. 497, an action at law to recover on a marine policy, it was held proper to admit expert testimony on the question whether it was good seamanship to tow an injured ship past an intermediate port to her home port, and also as to whether the vessel, after injury, was seaworthy. In upholding the admission of this testimony, it was pointed out that the trial court gave careful instructions to the jury as to the truth of what was contained in the hypothetical question asked, and also as to the weight to be given to expert testimony.

 We think the court below reached the right conclusion in holding that the cause of the collision was the fault of the Domira in following the Pinar across the channel, instead of proceeding down the channel on her starboard side. The danger of collision was more imminent in attempting to follow this

course in foggy weather with poor visibility. She was also blameworthy in failing to sound proper fog signals, as required by article 15 of the Inland Rules. Indeed, there is no testimony that the Domira sounded fog signals. None were heard by either the Irland or the Pinar. The rule required the blowing of a signal, under the circumstances here, at intervals of not more than one minute. The Walter Franks, 299 F. 319 (C. C. A. 2); The Frank S. Hall (D. C.) 116 F. 559; The Georgia (D. C.) 208 F. 635. She was blameworthy for proceeding at an immoderate speed in the fog and violating article 16 of the Inland Rules. Under the conditions, the Domira should have proceeded at a moderate speed, as required by article 16. There is sufficient in the testimony of the pilot to justify the claim that she was proceeding at half speed for about three minutes before the Irland's fog signal was heard. This would be about 7 or 8 knots an hour. The court found that the Domira was proceeding at greater speed than the Pinar and was overtaking her, and was on her starboard quarter while the Irland was stopped. There were no witnesses produced as to speed, except the pilot; the log entries as to speed were not produced. There was ample evidence of faulty navigation in violation of both articles 15 and 16 of the Inland Rules, and the Domira's negligence sufficiently accounts for the collision. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Gulf of Mexico, 281 F. 77 (C. C. A. 2); The Suffolk, 258 F. 219 (C. C. A. 2); The Bolton Castle, 250 F. 403 (C. C. A. 1).

We think the Irland's navigation, as well as that of the Pinar, was without fault, and both were properly exonerated.

Decree affirmed.