### THE SOUTHERN CROSS.

### THE QUIRIGUA.
#### No. 100.

Circuit Court of Appeals, Second Circuit.
Dec. 6, 1937.

Morgan & Lockwood, of New York City (Mark W. Maclay, of New York City, of counsel), for appellants.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for the Quirigua.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

The Southern Cross, owned by the libelant, was a combination passenger and cargo steamship, 535 feet long, 72 feet wide, and 30 feet 7 inches loaded draft. While at anchor in the Ambrose Channel, due to a fog, she was in a collision with the S. S. Quirigua, a similar passenger and cargo vessel owned by the respondent, 448 feet long and 60 feet wide. Each vessel had flush decks fore and aft, with a large superstructure amidships, and each was equipped with a regulation fog bell on the forward deck.

The Southern Cross was bound out to sea to South American ports, but had been at anchor one and a half hours before the inbound Quirigua collided with her stern. When the Southern Cross departed from her pier, visibility was fair and the tide flood. An experienced captain was in command and a harbor pilot was in charge of her navigation. Both were on the bridge with a watch officer, a quartermaster, and a cadet. On the forecastle head were the chief officer, the carpenter, boatswain, and a lookout. As she proceeded outbound, she encountered fog off the Battery. The density of the fog caused her to anchor off Clifton, S. I. When the tidal current at Clifton turned from flood to ebb, she proceeded out, but, while going through the Narrows, the fog again became thick and her captain and pilot decided to anchor. As we find, she anchored in the channel at about 2:58 p. m. The collision occurred between 4:35 and 4:36 p. m. Between 2:58 and 4:36 p. m. there were no substantial changes in visibility, which was about 200 or 250 feet.

The Quirigua passed Buoy 14 at 4:12 and from that time until the collision her lookout said there was visibility for about 250 feet. After the collision she departed in the fog and could be seen for only about 300 feet. At collision the headings were Southern Cross about 340° true and the Quirigua 343° true. The distance from Buoy 14 to the point of collision was about three and a fourth mile, which the Quirigua covered in 24 minutes at the rate of 8 knots over the ground or 9½ knots through the water. It is very certain that the Quirigua could not stop within the

distance she saw the Southern Cross. The Quirigua at no time attempted to anchor. She passed Buoy 14, the last turn in the channel, at a distance of about 600 feet, and laid a course of 347°. This is the channel course. She made no allowance for the set of the tide on her port bow. Her pilot said he never experienced any difficulties with it. The velocity of the tide was about 1.6, and, assuming she drifted over to eastward five to six hundred feet, after 24 minutes on the tide, it would carry her to the projected line of Ambrose Channel opposite Craven Shoal Buoy and about 150 yards west of the anchorage. From this we are satisfied that the Southern Cross was in the channel when anchored and struck in the collision. The several positions of the Southern Cross as testified to by her officers are of little value in fixing her position. No one on board this vessel took any bearings. Their estimates in regard to their position in what is conceded to be a dense fog should not be relied on. The LaBourgogne, 86 F. 475 (C.C.A.2).

■■ Anchoring thus in the fairway was an obstruction to navigation and a fault which helped to bring about this collision. 33 U.S.C.A. § 409. There was no emergency requiring her to do so. To be sure, good navigation required her to anchor, but not in the channel, for she could have proceeded to an anchorage ground but a few hundred yards away. Nothing prevented her from shifting from the channel into the anchorage ground after she had swung to the tide and was heading to the northward. Having anchored in the fairway, she must justify her position there. The La Bourgogne, supra; The Lehigh, 15 F.Supp. 425 (D.C.E.D.N.Y.), affirmed 84 F.2d 1002 (C.C.A.2); The City of Chattanooga, 79 F.2d 23 (C.C.A.2); The Limon, 35 F.2d 730 (C.C.A.1); The Persian, 181 F. 439 (C.C.A.2.).

The authorities to which libelant refers are distinguishable. In The City of Norfolk, 266 F. 641, the anchored vessel was lying partly within and partly without the channel, and the Fourth Circuit Court of Appeals said that all the circumstances and conditions, the width of the channel, the flow of the tide, the force of the wind, the probability of meeting other vessels, the size of the ship and distance and course to the nearest anchorage, relieved it from blame. Interlake S. S. Co. v. Great Lakes Transit Corporation, 89 F.2d 694 (C.C.A.2), was a clear weather case where the anchored vessel could be seen in ample time. In a fog, the position of the Southern Cross in the channel was a danger. In The Providence, 67 F.2d 865 (C.C.A.2), the moving vessel had several times safely passed the anchored vessel which was not in the channel of the moving vessel, and the latter was held at fault in getting off her course in the fog and navigating outside her channel.

■■ The Quirigua was clearly at fault for colliding with an anchored vessel. The Virginia Ehrman, 97 U.S. 309, 24 L.Ed. 890; The Providence, supra. She has not explained why she was moving at all under existing conditions, certainly not in moving at the admitted speed. After passing Buoy 14 and until the point of collision, her visibility was about 250 feet. Under such atmospheric conditions she could and should have sought an anchorage immediately. There were three available localities. Her maximum drift was 23'6". After passing Buoy 16, she could have gone a safe distance out of the channel and anchored. After passing Buoy 18, there was sufficient water for her east of the line of the channel between Buoy 18 and the Gravesend Anchorage grounds. She might also have anchored at the Gravesend Anchorage.

■■ If she could not maintain steerageway and at the same time keep her speed under control, she must come to anchor. The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Youngstown, 40 F.2d 420 (C.C.A.2); The Haven, 277 F. 957 (C.C.A. 2). Her captain expressly admitted, whatever may be the speed she was making, that she was unable to stop within the distance he could see ahead. This is explanatory of the collision and a violation of the statutory requirement of moderate speed in fog. The Umbria, supra; The Providence, supra; New York Central R. Co. v. City of New York, 19 F.2d 294 (C.C.A.2); The Manchioneal, 243 F. 801, 805 (C.C.A.2); The Nacoochee, 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687.

These faults are sufficient to hold the Quirigua for her negligent participation in the collision. Both vessels were properly held liable.

Decree affirmed.