**SCINDIA STEAM NAV. CO.**
v.
**STANDARD OIL CO. (N. J.) et al.**

**STANDARD OIL CO. (N. J.)**
v.
**THE JALAKETU et al.**

**FEDERAL INS. CO. et al.**
v.
**STANDARD OIL CO. (N. J.) et al.**

**THE MARINE LEADER.**

United States District Court
S.D. New York.
April 28, 1954.

Herbert P. Reid, New York City, proctor for Scindia Steam Navigation Co., Ltd. and S.S. Jalaketu; Kirlin, Campbell & Keating, New York City, proctors for Standard Oil Co. (N. J.), Eugene F. Gilligan, Raymond T. Greene, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, proctors for Federal Ins. Co., et al., Richard F. Shaw, Donald M. Waesche, Jr., New York City, of counsel.

McGOHEY, District Judge.

On May 1, 1949, at approximately 5:21 P.M., the S.S. Marine Leader, a T–2 type tanker owned pro hac vice by the Standard Oil Company of New Jersey, while outward bound, in ballast, from New York was in collision in New York Harbor with the anchored and heavily laden S.S. Jalaketu, Indian registry, owned by Scindia Steam Navigation Co., Ltd.

Scindia's claim is that during a heavy fog The Jalaketu was anchored in an area appropriate for anchorage, seven-eighths of a mile due east of buoy 2A at the seaward entrance to Ambrose Channel and well north of the northern boundary of the channel extension, and was sounding the required signals; that the outward bound Marine Leader through faulty navigation and seamanship was proceeding down the inbound side of the channel on a wrong course and at a rate of speed which under the existing conditions was at least immoderate; that her course took her out of the channel and north of buoy 2A and into the area where The Jalaketu lay; that by reason of her failure to maintain an alert watch, she did not hear or heed The Jalaketu's anchor signals and ran into her port side at about number 5 hold which became flooded, with consequent damage to the cargo there stowed.

Scindia Steam Navigation Co., Ltd. (hereafter called Scindia), as owner of The Jalaketu, filed a libel against the S.S. Marine Leader in rem, and against the Standard Oil Company of New Jersey in personam, as owner pro hac vice. Standard filed a cross libel against The Jalaketu in rem, demanding, in addition to its own damages, any which might be recoverable from The Marine Leader or its owner by the owners of cargo on board The Jalaketu. Federal Insurance Company, et al., as parties interested in this cargo, filed a libel against Standard in personam, and The Marine Leader in rem. Standard thereupon filed an impleading petition against Scindia and The Jalaketu. All suits have been consolidated for trial.

The numbered paragraphs contain the Court's findings of fact.

1. The S.S. Jalaketu is a single-screw cargo vessel of 7,180 gross tons, 441½ feet in length, 57 feet beam, 37 feet moulded depth; and at all the times herein mentioned was owned and operated by The Scindia Steam Navigation Company, Ltd.

2. The S.S. Marine Leader is a single-screw T–2 tanker, 10,172 gross tons, 504 feet in length, 68 feet 2 inches beam; and at all the times herein mentioned was being operated by the Standard Oil Company (N. J.) as owner pro hac vice.

3. The various libellants in A. 162–304 are the owners and/or parties in interest of The Jalaketu's cargo which was damaged in part in the collision.

4. The parties have treated the channel extension seaward of buoys 2A and 1A as part of the channel itself for all practical purposes. It is so marked on the charts and it is customary to make the approach to the harbor from Ambrose Light Vessel along a stated course which is that of the center range of the channel itself. It is conceded that on May 1, 1949 low water at the Battery was at 3:54 P.M.[1]

5. At 1:26 The Jalaketu inbound from Ambrose Light Vessel embarked Captain Donnelly, a Sandy Hook Pilot, somewhere between Ambrose Light Vessel and Gedney sea buoy. By the time she reached the sea buoy, fog had closed

1. All times hereafter stated are P.M.

in but she continued up the channel extension on the assigned channel course of 297 degrees True. At 2:00 the pilot observed the channel entrance buoy 2A about 100 feet to port, either abeam or just off the port bow. Since the buoy would normally have been to his starboard, he concluded that he had already crossed the northern boundary of the channel. To continue on this northwesterly course would very shortly have brought him into water too shallow for his vessel which drew 26 feet. He therefore determined to seek a safe anchorage to the N.E. of buoy 2A until the fog cleared enough to enable him safely to proceed up the channel.

6. The vessel was backed off from the buoy and brought around hard right. She then proceeded to anchorage which was effected at 2:21. The tide, then about four hours old and running S.E. at approximately 2.5 knots, tended to set The Jalaketu back into the channel extension. As shown in her bell book, between 2:00 and 2:21, there were 9½ minutes of stern motion, 8½ minutes when the engines were stopped and 3 minutes full ahead. Her speed at full ahead was about 10 knots. At that speed, in three minutes she would travel only one-half mile. As is conceded, stern action in a single-screw vessel such as The Jalaketu has the effect of swinging the stern to port and the bow to starboard. The joint effect of the stern action and the tide was to bring The Jalaketu back into the channel extension and heading N. or perhaps even N.E. The added effect of the hard right rudder and rounding to put The Jalaketu during the three minutes of forward motion on a heading almost parallel to that of the channel.

7. She anchored with four and a half shackles of chain in the water. Immediately after anchorage with The Jalaketu laying out on her chain, her stern was approximately 800 feet from the anchor's position and, due to the state of the tide, the ship was heading approximately 315 degrees and tailing just slightly toward the fairway. No attempt was made to fix her approximate position by taking radio bearings, although facilities to do so were available.

8. During the next two hours the tide went from ebb to slack, and at the time of collision the flood was just beginning. By that time The Jalaketu had swung on her anchor to a northeasterly heading, roughly perpendicular to the channel course. Therefore unless her anchor had been dropped at a point more than 800 feet north of the northern boundary of the channel extension, The Jalaketu of necessity must have been at least partially in the fairway at collision, although concededly at 2:21 when anchorage was effected she may have been clear of the fairway because of the then state of the tide.

The Jalaketu's pilot and master "estimated" that her anchored position was a point ⅞ of a mile due east of buoy 2A. However, as has been found, no attempt had been made to fix her anchorage position. This mere estimate is rejected. It is inconsistent with the vessel's action as recorded in the bell book, and testified to by the pilot and master. Moreover, as has been found, the vessel was incapable of traveling more than one-half mile in the three minutes of forward motion with her engines at full ahead.

9. The Coast Guard Cutter Tamaroa fixed The Jalaketu's position by radar at 10:30 as only 750 yards due east of buoy 2A. However, the operator conceded that radar fixes are subject to some error—in practice an error of a mile is arbitrarily assumed—although he said he thought he could operate within 100 yard accuracy. On this occasion, as he admitted, he did not follow the most precise procedure for fixing a vessel's position.

10. By 10:30 the tide, approximately one-half hour after high, had swung The Jalaketu to a heading somewhat between S.E. and S. At that time the distance from her stern to the anchor's position had been shortened to about 600 feet because immediately after the collision she had taken in two and a half shackles of chain.

11. Measuring 600 feet from the stern of The Jalaketu, as fixed by the Coast Guard, along a southeasterly course, would determine where the anchor had been dropped. Then measuring 800 feet from that position along a course reciprocal to her 45 degree heading at the time of collision, would put her stern approximately on the northern boundary extension. However, a slight error in the radar fix or in the assumed heading used for plotting purposes would place her either further south into the channel extension or farther to the north of it.

12. The testimony of the captain of The Moran tug is too vague to be of help except that it corroborates that at 10:30 The Jalaketu was north of the channel extension. The same is true of the visual bearing taken by the cadet third officer of The Jalaketu. It was taken in haste, apparently incorrectly recorded, and then corrected by the master who assumed it was a reverse bearing, but who did not check it.

13. The acceptable testimony of The Jalaketu is too equivocal to support a finding as to the vessel's true position at the time of collision. The variables are so numerous and minute differences in distances so pertinent that the testimony might as well support a finding that she was at least partly in the channel as a finding that she was clear of it. The Marine Leader's testimony as to its position, and consequently that of The Jalaketu, at the time of collision is more definite and, as will appear, the finding as to position based on it is not inconsistent with the foregoing findings based on The Jalaketu's testimony. From The Marine Leader's testimony the following further findings are made.

14. The Marine Leader, after leaving Bayonne, N. J. and proceeding down the bay, anchored in the vicinity of Craven Shoal at 2:15 to wait for the fog to clear. She was being navigated by Captain Martin, a licensed Sandy Hook Pilot.

15. At 4:24 she got under way and proceeded down Ambrose Channel, arriving at channel buoy 9 at 4:49. Visibility was then between 900 and 1000 feet. Buoy 9 was visually observed at about 500 to 600 feet off the starboard beam. Her heading was then altered to 113 degrees True to make good the channel true course of 117 degrees, allowing for a four degree southwesterly set of the tide which then existed. Buoy 7A at 4:52 and buoy 7 at 4:55 were both observed at about 600 feet off the starboard beam. After passing buoy 7 the tide went slack but the ship's heading was not changed.

16. From her last known position 600 feet off buoy 7 at 4:55,[2] The Marine Leader proceeded down channel on an average true heading of 114 degrees until at 5:16 buoy 2A was observed abeam 500 feet to port.[3] Visibility was 500–600 feet.

17. The measured track from the position as found off buoy 7 to the position as found off buoy 2A is 114 degrees. In other words, The Marine Leader, because of the slack tide, had made good a track exactly equal to its own average true heading. Her engines were at half speed ahead and her measured speed over ground was 8.3 knots. Had she continued on this course at that speed she would eventually have left the channel but not for a mile or more further out and not until approximately seven minutes later. However, on sighting buoy 2A to port at 5:16 her heading was changed to 120 degrees True, in order to bring her into the starboard side of the channel extension. About five minutes later while on that heading she was in collision with The Jalaketu.

---

2. Pilot Martin's testimony that he observed buoys 5 and 5A at approximately the same distance to starboard is rejected. These sightings were not recorded in the log, and neither the master nor others in the crew could remember seeing these buoys.

3. The vessel's distance off this buoy was variously estimated at from 500–900 feet. In view of finding that visibility was between 500–600 feet, the pilot's estimate that 2A was 900 feet off his port beam is rejected.

18. On these facts, which are not only amply shown by the testimony of the witnesses but are supported by The Marine Leader's official logs and by her gyro course recorder, it was physically impossible for her to have been anywhere but in the channel extension at the time of collision.

The proctor for The Jalaketu contends that The Marine Leader crossed the northern boundary of the channel with buoy 2A to starboard, or at least that she overran the buoy. To substantiate this theory he adopts an assumed position abeam buoy 9 and an arbitrary course from there on. The hypothetical track he suggests is not in accord with the uncontradicted testimony and the finding that buoy 7 was about 600 feet off the starboard beam at 4:55. This was exactly one hour after low water, at which time a S.W. set was still being experienced between buoys 9 and 7. Furthermore, in view of the number of witnesses whose testimony consistently places buoy 2A on The Marine Leader's port beam, libellants' mere hypothesis cannot overcome such positive testimony and is rejected.

The crucial period after all is from 5:16 until 5:21, the time of collision. The 5:16 position as found is a new starting point and evidence of what occurred prior thereto is material only in so far as it shows the existing conditions or tends to corroborate the positive testimony.

19. At 5:16 the tide, as shown by the tide tables, was slack. At that time, or within a minute thereafter, The Marine Leader began her alteration to 120 degrees True. During her turn and after steadying on 120 degrees until the collision at 5:21, she was on a heading which would bring her farther south into the channel rather than across its northern boundary.

20. At no time after passing buoy 7 until after the collision did The Marine Leader leave the channel, and she was in the inbound lane of the channel at the time of collision.

21. The Jalaketu also, therefore, was at least partially in the inbound lane of the channel when she was rammed.

As pointed out above, this finding is consistent with The Jalaketu's evidence which of itself was inconclusive. Moreover it is supported by the testimony of the disinterested crew members of the outbound S.S. American Judge and the inbound S.S. Bradford Island. Their testimony is accepted and on it the following findings are made.

22. The captain of The American Judge while proceeding down the channel on the afternoon in question, following 3 to 4 miles behind another outbound vessel, saw on his radar-scope the outbound vessel ahead of him closing upon a vessel anchored in the channel. The radar images finally merged into one large and indistinct image. He could not identify the two vessels but since there were no other vessels known to have been in the vicinity and no others appeared on the radar-scope, except a vessel inbound but some distance seaward of the merging vessels, it is reasonable to assume that what appeared on his scope were The Marine Leader and The Jalaketu, and I find that they were. The master of The American Judge had a slight glimpse of one of the vessels at the time he was passing the outbound channel buoy 1A, companion buoy of 2A, but was unable to identify it.

23. Hewett, the mate of The Bradford Island, an inbound tanker which arrived in the vicinity of the collision position at approximately 6:00, placed The Jalaketu at that time on the northern edge of the channel. He had maintained a radar watch from a time prior to his arrival at the Gedney sea buoy until after arrival in the area of the collision and a visual sighting of the two vessels involved. From the time his vessel was abeam Gedney sea buoy he had under radar observation two objects which at first he mistakenly believed to be the channel entrance buoys 2A and 1A. The Bradford Island was on a channel course of 297 degrees which lay directly between the above mentioned ob-

jects. As she continued inbound these objects enlarged on the radar screen until it became apparent that they represented ships and not the entrance buoys. Stretching out to the N.W. behind these objects, Hewett observed on his radarscope the double row of channel buoys, and the course of The Bradford Island likewise lay directly between these rows of buoys. Hewett's explanation that buoys 2A and 1A were obscured by the anchored vessels is probably correct since radar impulses which follow the line of sight would not be reflected from a small buoy wholly or partially blocked by a large vessel. I find that The Bradford Island was actually proceedng up the channel on the regular course.

24. When The Bradford Island was in close proximity to the objects observed in the radar-scope, The Jalaketu was observed off her starboard bow on a heading reciprocal to that of The Bradford Island, thus paralleling the channel course but headed outbound, and so close as to cause the latter's pilot to order a sharp swing to port. This position of The Jalaketu was in accord with the state of the tide two hours after low water. Forty minutes earlier when the tide was changing from slack to flood, The Jalaketu was on a heading of 45 degrees and perpendicular to the channel. Logically therefore, to be on the northern boundary and parallel thereto at 6:00, The Jalaketu must have been in the channel extension at 5:20 when it was on a heading perpendicular to the boundary.

25. Immediately after executing the hard aport order The Bradford Island observed The Marine Leader, also anchored in the channel, off the port bow and the former's pilot ordered hard astarboard to avoid collision. Then having passed under The Jalaketu's stern, The Bradford Island was brought to anchorage, N.E. of buoy 2A at 6:24. This anchorage position was fixed at the time by three radar cross-bearings. A plot of these bearings establishes the anchorage position of The Bradford Island to have been about 1000 yards, E.N.E. of buoy 2A on a true bearing of N. 70 E. In effecting this anchorage Captain McDonald, without determining with pinpoint accuracy The Jalaketu's position, which was south of his, allowed a safe swinging distance of not less than 300 yards between the ships. At 10:30 when the visibility cleared, The Bradford Island's anchorage position was checked by visual bearings and was found to be substantially in accord with the prior radar fix. At this time The Jalaketu was observed at anchor nearly on a line with the channel buoys and seaward of them. Of course, by this time The Jalaketu's stern had been swung still further to the north by the tide and she was probably tailing between N.W. and N.

26. From all of the foregoing I find that at the time of collision both The Jalaketu and The Marine Leader were actually in the channel extension on the inbound side.

27. At all times during her progress down the channel and at collision, The Marine Leader was sounding under way fog signals at intervals of less than a minute.

28. Her master, second officer and a helmsman were on duty on the bridge. A seaman was stationed on the forecastlehead on lookout at all times. A ship's officer was also stationed there. All were alert and vigilant.

29. Prior to 5:16 no fog signals of other vessels at anchor or under way were heard on The Marine Leader while navigating the lower reaches of Ambrose Channel except a vessel proceeding astern of her.

30. Shortly after passing buoy 2A at 5:16 and while on the heading of 120 degrees True, a distant fog whistle of a vessel was heard off the starboard bow. This was identified as the fog signal of the pilot boat. On first hearing that signal, The Marine Leader's speed was reduced to slow and then, when the identity and location of the pilot boat were established, increased to half ahead.

31. Very shortly thereafter The Jalaketu was sighted about 500 feet

ahead of The Marine Leader and lying athwart her course, port side to The Marine Leader. Visibility was then about 500 feet.

32. The Marine Leader's engines were immediately put full speed astern at 5:20½ and her rudder hard right; immediately thereafter the starboard anchor was let go at about 5:21. However, because of her speed she was unable to stop and her bow cut into the port side of The Jalaketu near No. 5 hold at an angle of between 60 and 90 degrees.

33. No fog bell from The Jalaketu was heard aboard The Marine Leader prior to sighting. A fog bell from The Jalaketu was first heard aboard The Marine Leader at about the time the latter dropped her anchor. The Jalaketu was not properly sounding her fog bell prior to the collision.

The Jalaketu contends that The Marine Leader was at fault in negligently allowing for a set which was nonexistent and which her pilot should have known was non-existent, and in proceeding at a speed which was excessive in view of the weather conditions. The Marine Leader in turn contends that The Jalaketu was at fault by being improperly anchored in a frequented channel and not sounding the statutory anchor fog signals; and that since The Marine Leader was not apprised of The Jalaketu's whereabouts by signals, she was justified in assuming the channel to be clear and therefore her speed was not excessive under these circumstances. The Jalaketu counters that since she herself attained or attempted to attain a safe anchorage under the conditions and maintained an adequate anchor watch she is not [contributorily] at fault.

■ Considering first the affirmative contentions of The Jalaketu it seems clear that The Marine Leader was violating the "Narrow Channel"[4] rule by navigating down the port side of the channel, and Inland Rule 16 [5] by proceeding at immoderate speed. Even if Pilot Martin's estimate that buoy 2A was 800–900 feet off his port bow were accepted, he also nevertheless placed the collision north of the center range. The narrow channel rule applies in fog as well as clear weather.[6] The risk of collision is increased by fog. The difficulty of maintaining a course down the starboard side of a narrow channel is likewise increased in fog, it is true, and there may be unusual situations where although there is no negligence involved the navigator is unable to maintain his starboard hand course. Here, however, The Marine Leader's pilot continued to allow for a set after he passed buoy 7. As a licensed Sandy Hook Pilot, he should have known it had ceased to exist at about that time. When he discovered his error at buoy 2A he changed the course but this was too late to avoid the collision.

■ 34. The Marine Leader was in violation of Rule 25 through her pilot's negligence in failing to correct her course after the westerly set ceased.

35. The Marine Leader's speed was too great to permit her to stop within 500 feet, the limit of visibility.

36. Under the circumstances her speed was at least immoderate, in violation of Rule 16.

■■ Violation of the rules constitutes statutory fault and therefore it is incumbent upon The Marine Leader to show that the violation could not have contributed to the collision.[7] This she has not done, nor does it seem likely that such a showing would be possible under these circumstances. She urges that while her speed may have been excessive had she known of The Jalaketu's

---

4. 33 U.S.C.A. § 210.

5. 33 U.S.C.A. § 192.

6. Southern Pac. Co. v. U. S. (El Sol), 2 Cir., 1934, 72 F.2d 212; The Domira, 2 Cir., 1932, 56 F.2d 585; The S. V. Luckenbach, 2 Cir., 1912, 197 F. 888.

7. The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; The Martello, 1894, 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637.

presence, she was unaware of this since the latter was not sounding the proper anchor fog signals and is therefore not at fault. This has no merit in the circumstances found here. The cases cited for this general proposition [8] do not concern a vessel proceeding on the wrong side of a busy channel where at the very least incoming vessels, if not a vessel at anchor, might be anticipated. The Marine Leader, as has been found, was proceeding at such speed that she could not be stopped within the existing limit of visibility.[9] Certainly for a vessel on the port hand side of Ambrose Channel, in fog, such speed was immoderate.[10]

■ Taking up now The Marine Leader's contentions, it has been found that The Jalaketu was in the channel at the time of the collision. It is true that the channel extension is 1800 feet wide in this vicinity and that at most The Jalaketu was obstructing only 500 feet of the inbound lane. However, she was in a busy channel. Visibility was only 500 feet and inbound vessels were required to be careful to observe the narrow channel rule. Accordingly, unnecessary obstruction of more than half of the inbound lane cannot be excused.[11] Furthermore, it was negligent seamanship to anchor so close to the channel that the tide would swing the ship broadside to the path of oncoming ships, when there was water of ample depth for a ship of this draft farther to the north out of the channel. It was also negligent seamanship to omit the simple precaution of checking the estimated anchorage position by means of radio bearings.[12] It is argued that radio bearings are inaccurate and indeed they are. But surely cross-bearings

from stations in close proximity over water are better than no knowledge at all, especially when anchorage was not effected until 21 minutes after a visual fix, during which time there was 9½ minutes of stern action and 8½ minutes of drift in a strong ebb tide. Accordingly these further findings are made.

37. The Jalaketu's pilot and officers were negligent in anchoring so close to the channel and in failing to take all available precautions to check her position at the time of anchoring.

38. The Jalaketu was unnecessarily obstructing the channel in violation of law,[13] at the time of collision.

As to The Jalaketu's signals, testimony by various members of The Jalaketu's crew shows only that orders were given to ring the anchor bell signal; and that at unspecified times from 2:00 to 5:20 it was heard aboard the ship. But it seems most likely that it was not being rung regularly as required by law. It is conceded that the bell was a "good loud bell" and that conditions of wind and weather were good for hearing sound over water. The Marine Leader had heard and acted on the fog whistle of the pilot boat only a few minutes before the collision. Her watch was alert. It is most unlikely therefore that these men would not have heard the bell if it were being rung. It is inconceivable that if they had heard it they would not have taken timely and effective action to protect their ship and themselves, as they did when they heard the pilot boat's whistle. From all the testimony about the bell the following further findings are made.

8. Erie & Western Transportation Co. v. City of Chicago, 7 Cir., 1910, 178 F. 42, certiorari denied 216 U.S. 620, 30 S.Ct. 574, 54 L.Ed. 641; The Sagamore, 1 Cir., 1917, 247 F. 743, 751.

9. The Chattahoochee, 1899, 173 U.S. 540, 548, 19 S.Ct. 491, 43 L.Ed. 801; The City of Norfolk, 4 Cir., 1920, 266 F. 641, 645; The Georgia, D.C.R.I.1913, 208 F. 635, 638; The Southern Cross, 2 Cir., 1937, 93 F.2d 297, 299; Gertrude Parker, Inc., v. Abrams, 1 Cir., 1949, 178 F.2d 259.

10. See The Martello, supra.

11. The Persian, 2 Cir., 1910, 181 F. 439; The Limon, 1 Cir., 1929, 35 F.2d 730, 731; The Socony No. 9, 2 Cir., 1934, 74 F.2d 233, 234; The Southern Cross, 2 Cir., 1937, 93 F.2d 297, 299; The William C. Atwater, 2 Cir., 1940, 110 F.2d 644, 645.

12. 33 U.S.C.A. § 221.

13. 33 U.S.C.A. § 409.

39. At the time the ships sighted each other at about 500 feet, The Jalaketu's pilot was in and about the pilot house. The chief officer who had the watch was in his cabin reading. The ship's master was in his cabin. There was no licensed ship's officer on the bridge or on the forecastlehead.

40. On the forecastlehead, alone, was a 20 year old Indian who spoke no English, whose instructions had been relayed to him by the seaman whom he had relieved. These instructions as recited by the young Indian, through the acting third mate as interpreter, were practically verbatim the words of the Inland Rule. The young man, however, had no watch and did not know the number of seconds in a minute. He was hesitant about telling time, and admitted that he rang the bell when he thought the proper time had elapsed. He did not speak the language of the officers or of the pilot, and it appears that not all members of the crew were able to make themselves mutually understood.

41. I find that The Jalaketu's bell was not being rung at the intervals required by law.

Conclusions of Law

1. Both vessels were at fault and should share the damages equally.

2. The owners and parties in interest of Jalaketu's cargo are entitled to recover from Marine Leader full damages,[14] including general average contributions.[15]

3. The Marine Leader is entitled to recover from The Jalaketu one-half of the damages recovered by cargo from The Marine Leader.[16]

An interlocutory decree may be entered in accordance herewith, and providing for reference of the question of damages to a special master.

Submit proposed decree.

14. The Chattahoochee, 1899, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801.

15. Aktieselskabet Cuzco v. The Sucarseco, 1935, 294 U.S. 394, 55 S.Ct. 467, 79 L. Ed. 942.

16. The Grecian (City of Chattanooga), 2 Cir., 1935, 78 F.2d 657, 1935 A.M.C. 1039.